JUDGE NATHAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,          :

                        **Plaintiff**,          :

                                    :

  -against-          :

                                    :          17-CV-          (   )

AVANEESH KRISHNAMOORTHY,          :

                        **Defendant**,          :

                                    :

  -and-          :

                                    :

SHREYA ACHAR,          :

                     **Relief Defendant**.          :
------------------------------------------------------------------------x

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE* EMERGENCY APPLICATION FOR AN ASSET FREEZE AND OTHER RELIEF

Preethi Krishnamurthy
Alison R. Levine
Thomas P. Smith, Jr.
Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0116 (Krishnamurthy)

April 24, 2017

# TABLE OF CONTENTS

PRELIMINARY STATEMENT------------------------------------------------------------- 1

STATEMENT OF FACTS ---------------------------------------------------------------- 2

   I.     BACKGROUND---------------------------------------------------------------- 2

   II.    THE INVESTMENT BANK'S
        CONFIDENTIALITY AND TRADING POLICIES ------------------------------- 3

   III.   KRISHNAMOORTHY'S AND ACHAR'S UNDISCLOSED ACCOUNTS----------- 4

   IV.   KRISHNAMOORTHY TRADES ON THE INVESTMENT BANK'S
        CONFIDENTIAL NEUSTAR ACQUISITION INFORMATION ------------------- 4

        A.  Krishnamoorthy Learns of the Planned Acquisition ------------------------- 4

        B.  Krishnamoorthy Trades in NeuStar Securities and Obtains
            More Information About the NeuStar Acquisition ------------------------------- 5

        C.  NeuStar Announces Its Planned Acquisition by the Private Equity Firm ------------ 7

        D.  Krishnamoorthy and Achar Profit from the NeuStar Positions ------------------------- 7

   V.     ACHAR TRANSFERS FUNDS FROM HER BROKERAGE ACCOUNT----------- 8

ARGUMENT------------------------------------------------------------------------------ 8

   I.     THE COURT SHOULD FREEZE KRISHNAMOORTHY'S ASSETS ----------------- 8

        A.  The Commission Is Likely To Succeed on Its Claims Under
            Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5----------- 9

            1.   *Acquisition The Investment Bank's NeuStar Information Was Material* ---------------------- 10

            2.   *The NeuStar Acquisition Information Was Non-Public* ------------------------------------- 11

            3.   *Krishnamoorthy Misused or Misappropriated the Information By Trading on It* -------------- 12

            4.   *Krishnamoorthy's Trades Breached His Duties of Trust and Confidence for Secret Profit* --- 13

            5.   *Krishnamoorthy Acted With Scienter* ------------------------------------------------------ 14

        B.  The Court Should Freeze Krishnamoorthy's Assets, Up to $74,225.10--------------- 15

II.      THE COURT SHOULD FREEZE ACHAR'S ASSETS, UP TO $29,917.50 ----------- 16

III.     THE COURT SHOULD ORDER KRISHNAMOORTHY
         TO REPATRIATE FUNDS LOCATED ABROAD -------------------------------------- 17

IV.      THE COURT SHOULD ORDER KRISHNAMOORTHY AND
         ACHAR NOT TO ALTER, DESTROY, OR CONCEAL DOCUMENTS ------------ 18

CONCLUSION ------------------------------------------------------------------------------------- 19

# TABLE OF AUTHORITIES

**CASES**

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ...........................................................................11

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ...................................................................14

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ........................................................15

*Salman v. United States*, 137 S. Ct. 420, 423 (2016) ..................................................................9

*SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998) ...............................................................17

*SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *13 (S.D.N.Y. July 29, 2011) .....17

*SEC v. Conradt*, 947 F. Supp. 2d 406, 410 (S.D.N.Y. 2013) ....................................................10

*SEC v. Drucker*, 528 F.Supp.2d 450, 452 (S.D.N.Y. 2007) .....................................................12

*SEC v. Illarramendi*, 2011 WL 2457734, at *6 (D. Conn. 2011) ..............................................18

*SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ......................................................................11

*SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) .........................................10

*SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) ..............................................................9, 13-15

*SEC v. Svoboda*, 409 F. Supp. 2d 331, 342 (S.D.N.Y. 2006) ..................................................10

*SEC v. Warde*, 151 F. 3d 42, 49 (2d Cir. 1998) .......................................................................15

*Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) ......................................................................16

*SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) .....................................................8, 9

*United States v. Libera*, 989 F.2d 596 (2d Cir. 1993) ...............................................................11

*United States v. O'Hagan*, 521 U.S. 642, 654 (1997) ..........................................................10, 13

*Whitman*, 904 F. Supp. 2d at 367 .............................................................................................14

## STATUTES

Securities Act of 1933

Section 17(a), 15 U.S.C. §77q(a)............................................................................*passim*

Securities Exchange Act of 1934

Section 10(b), 15 U.S.C. § 78j(b)...........................................................................*passim*

## RULES

Rule 10b-5, Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5 .............................*passim*

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this memorandum of law in support of its *ex parte* emergency application, by proposed order to show cause, against defendant Avaneesh Krishnamoorthy ("Krishnamoorthy") and relief defendant Shreya Achar ("Achar") (collectively, "Defendants"). The Commission seeks both a temporary restraining order pending a preliminary injunction and then a preliminary injunction (1) freezing Defendants' assets, (2) requiring Krishnamoorthy to repatriate assets now outside the United States, and (3) preventing Defendants from destroying or altering documents.

## PRELIMINARY STATEMENT

The Commission seeks emergency *ex parte* relief primarily to stop Defendants from dissipating their illegal insider trading proceeds and to prevent Defendants from moving the proceeds to foreign accounts. In November and December 2016, while employed as a vice president at an investment bank ("the Investment Bank"), Defendant Krishnamoorthy illegally traded on inside information about a transaction the Investment Bank was considering financing: a private equity firm's acquisition of NeuStar, Inc. ("NeuStar"), a publicly-traded company. Krishnamoorthy traded NeuStar securities in both his own brokerage account and the brokerage account of his wife, Relief Defendant Achar. Just before and after the transaction's public announcement, Krishnamoorthy and Achar closed out many of their trades for approximately $48,000 in realized and unrealized illegal profits. In violation of the Investment Bank's employee compliance policies, Krishnamoorthy had not disclosed these brokerage accounts or trades to the Investment Bank.

To preserve the *status quo* and ensure that Krishnamoorthy and Achar—Indian citizens and, in Krishnamoorthy's case, here in the United States on a temporary work visa—do not dissipate or expatriate the assets necessary to pay the likely monetary judgment to the Commission, the Commission seeks an order freezing their assets. Specifically, the Commission seeks an order freezing Krishnamoorthy's assets up to $163,977.60: the amount of a potential money judgment

against him, based on disgorgement of his ill-gotten gains, prejudgment interest, and a statutory civil

penalty of three times his and his wife's ill-gotten gains. Similarly, the Commission seeks an order

freezing Achar's assets up to $29,917.50: the amount of a potential money judgment against her as a

relief defendant, based on disgorgement of ill-gotten gains in her account from her husband's illegal

trades. The Commission also seeks an order requiring Krishnamoorthy to repatriate funds he holds

in foreign locations by moving them to the United States—up to the amount of any difference

between the total requested freeze amount of $163,977.60 and the amount of his assets in the

United States.[1] Finally, the Commission seeks an order preventing Defendants from destroying or

altering documents. The Court should enter an Order to Show Cause given the exigent

circumstances.

## STATEMENT OF FACTS

### I.   BACKGROUND

From approximately March 2015 until at least April 2017, the Investment Bank, a broker-dealer

registered with the Commission, employed Krishnamoorthy in its Manhattan office as a vice president

and market risk specialist in the firm's risk management department. (Hendelman Decl. at ¶ 8 and

Ex. 2; Levine Decl. at ¶ 10.)[2] His responsibilities included providing technical support to certain

internal committees that reviewed prospective business transactions and engagements. (Hendelman

Decl. at ¶ 8.)

---

[1]   For example, if Krishnamoorthy has unencumbered assets (capable of satisfying a judgment)
in the United States totaling $163,977.60, the Commission does not seek an order requiring
Krishnamoorthy to repatriate additional funds. If Krishnamoorthy has such assets in the United
States totaling only $100,000, the Commission seeks an order requiring Krishnamoorthy to
repatriate the difference between this amount and the total requested freeze amount, or $63,977.60.

[2]   "Hendelman Decl." means the Declaration of Neil Hendelman in Support of Plaintiff
Securities and Exchange Commission's *Ex Parte* Emergency Application for an Asset Freeze and
Other Relief. "Levine Decl." means the Local Rule 6.1 Declaration of Alison R. Levine in Support
of Plaintiff's *Ex Parte* Emergency Application for an Asset Freeze and Other Relief.

Krishnamoorthy, a citizen of India and resident of New Jersey, worked at the Investment Bank under a temporary work visa. (Hendelman Decl. at ¶¶ 7,11 and Ex. 1; Levine Decl. at ¶ 9.) His wife Achar, also an Indian citizen and New Jersey resident, has worked outside the securities industry. (Hendelman Decl. at ¶¶ 9–10 and Ex. 3.)

## II.   THE INVESTMENT BANK'S CONFIDENTIALITY AND TRADING POLICIES

From at least 2015 to the present, the Investment Bank's internal policies have prohibited employees from misusing confidential information by trading on it, as Krishnamoorthy knew. (Hendelman Decl. at ¶¶ 14,15 and Exs. 5 & 6.) For example, on March 2, 2015, Krishnamoorthy participated in the Investment Bank's new-hire orientation. (Hendelman Decl. at ¶ 14 and Ex. 5.) During the orientation, the Investment Bank informed Krishnamoorthy:

> Confidential information is non-public information regarding [the Investment Bank]'s business and activities,…as well as information obtained from an external source (such as a client [or] prospective client…) with the expectation (from a non-disclosure agreement or otherwise) that the information will not be publicly disclosed and will be used solely for the purpose for which it was conveyed….

> Certain confidential information received…or obtained by the [Investment Bank] may also be considered to be material non-public information ('MNPI') under the U.S. federal securities laws….

> Personnel are prohibited from buying, selling, or recommending any security…while in possession of MNPI relating to the issuer or the security. Personnel may not direct or encourage any person to act upon MNPI…. Violations of insider trading laws subject the [Investment Bank] and the individual to severe penalties, including fines and imprisonment.

(Hendelman Decl. at ¶ 14 and Ex. 5 at 4–5.)

From at least 2015 through the present, the Investment Bank's compliance policies have also required employees to disclose their personal brokerage accounts to the Investment Bank, as Krishnamoorthy knew. (Hendelman Decl. at ¶ 16 and Ex. 6.) For example, at Krishnamoorthy's March 2015 new-hire orientation, the Investment Bank informed him: "Employees must disclose all

securities trading accounts to Compliance. Employee Investment Policy extends to personal accounts maintained by your spouse." (Hendelman Decl. at ¶ 16 and Ex. 5 at 6.)

## III.   KRISHNAMOORTHY'S AND ACHAR'S UNDISCLOSED ACCOUNTS.

On approximately April 10, 2015—the month after his new-hire orientation—Krishnamoorthy opened an individual retirement account (the "IRA") with Interactive Brokers, LLC ("Interactive"). (Hendelman Decl. at ¶ 6 and Ex. 1.) Less than four months later, on approximately July 29, 2015, Achar opened a brokerage account with Interactive (the "Achar Account"). (Hendelman Decl. at ¶ 6 and Ex. 3.) Krishnamoorthy did not disclose either his IRA or the Achar Account to the Investment Bank, as required. (Levine Decl. at ¶ 12.)

## IV.   KRISHNAMOORTHY TRADES ON THE INVESTMENT BANK'S CONFIDENTIAL NEUSTAR ACQUISITION INFORMATION.

### A.   Krishnamoorthy Learns of the Planned Acquisition.

On approximately November 21, 2016, a private equity firm, Golden Gate Capital ("Golden Gate") approached the Investment Bank to seek financing for a potential business transaction involving NeuStar. (Hendelman Decl. at ¶ 17.) The next day, the Investment Bank executed a confidentiality agreement with Golden Gate. (Hendelman Decl. at ¶ 18 and Ex. 7.) Over the next few days, Golden Gate provided the Investment Bank with confidential due diligence materials. (Hendelman Decl. at ¶ 19.) The Investment Bank then prepared a summary of the proposal and diligence materials—a "Transaction Overview" and a "Capital Commitment Memorandum"—for the Investment Bank's loan committee to review in deciding whether to approve a loan to Golden Gate. (Hendelman Decl. at ¶ 19 and Exs. 8 and 10.)

On November 23, 2016—the day before Thanksgiving—the Investment Bank's New Business Group circulated the Transaction Overview internally to individual employees and email distribution lists that included Krishnamoorthy. (Hendelman Decl. at ¶¶ 20–21 and Exs. 8 and 9.) The New Business Group attached the Transaction Overview to an electronic message scheduling a

4

meeting of the firm's Debt Loan Committee to consider providing financing to Golden Gate for its contemplated purchase of NeuStar. (Hendelman Decl. at ¶ 20 and Ex. 8.) The meeting invitation stated that the attached material was "[h]ighly confidential" and warned recipients to "ensure that any individuals that are forwarded this invite are appropriately wall[-]crossed." (Hendelman Decl. at ¶ 20 and Ex. 8.)

The Transaction Overview described the Investment Bank's assignment: "[The Investment Bank] has been asked to provide financing for a potential acquisition of NeuStar" for Golden Gate. (Ex. 8 to the Hendelman Decl.) The document bore a footer stating "FOR INTERNAL USE ONLY" and "Written exclusively for use by personnel of" the Investment Bank. (*Id.*)

### B.   Krishnamoorthy Trades in NeuStar Securities and Obtains More Information About the NeuStar Acquisition.

On November 25, 2016—the first trading day after Krishnamoorthy received the Transaction Overview—the Achar Account bought 800 shares of NeuStar stock and bought 9 NeuStar call options with a strike price of $25.[3] (Hendelman Decl. at ¶ 27 and Ex. 11.) That day, NeuStar's stock opened at $25.10 per share and closed at $25.00 per share. (Hendelman Decl. at ¶ 27 and Exs. 11 and 13.) The Achar Account's NeuStar trades stood to profit if NeuStar's stock price rose. (Hendelman Decl. at ¶25.) Before November 25, the Achar Account had never traded in NeuStar securities. (Hendelman Decl. at ¶ 27.)

Three days later, on November 28, 2016, Krishnamoorthy received another electronic message scheduling a meeting that day for the Investment Bank's Debt Loan Committee to consider Golden Gate's financing proposal. (Hendelman Decl. at ¶¶ 22–23 and Ex.10.) The meeting notice attached a "Capital Commitment Memorandum" describing the NeuStar acquisition plan.

---

[3]    Each call option contract gives the buyer the right to purchase 100 shares of the corresponding stock from the seller at the strike price through the expiration date. *See, e.g.,* *http://www.investopedia.com/terms/c/calloption.asp*.

(Hendelman Decl. at ¶ 22 and Ex.10.) The meeting notice again warned that the information was "[h]ighly confidential." (Hendelman Decl. at ¶ 22 and Ex.10.)

The first page of the Capital Commitment Memorandum stated that it was "STRICTLY PRIVATE AND CONFIDENTIAL" and for "INTERNAL USE ONLY." (Hendelman Decl. at ¶ 22 and Ex.10.) The Capital Commitment Memorandum explained that the Investment Bank was asking the firm's Debt Loan Committee for "[a]pproval to underwrite [ ]% of $1,650 million of financing . . . in support of Golden Gate's . . . acquisition of NeuStar . . . ." (Hendelman Decl. at ¶ 22 and Ex.10.) The Capital Commitment Memorandum also provided Golden Gate's contemplated purchase price of $2.565 billion or "22% premium to Friday[']s close of $25.00," meaning $30.50 per share. (Hendelman Decl. at ¶ 22 and Ex.10.)

On November 29, 2016—the day after receiving the Capital Commitment Memorandum—Krishnamoorthy bought 30 NeuStar call options expiring on December 16, 2016 with a strike price of $25 in his IRA. (Hendelman Decl. at ¶ 28 and Ex. 11.) That day, NeuStar's stock price opened and closed below $25, allowing Krishnamoorthy to profit only if the stock price rose above $25. (Hendelman Decl. at ¶ 28 and Exs. 11 and 13.) Before November 29, Krishnamoorthy had never traded in NeuStar securities in his IRA. (Hendelman Decl. at ¶ 28.)

The same day, the Achar Account also continued buying call options with a strike price of $25 and an expiration date of December 16, 2016 and sold some call options with a strike price of $30 and expiration dates of April 21 and July 21, 2017. (Hendelman Decl. at ¶ 28 and Ex. 11.) The Achar Account essentially still stood to profit if NeuStar's stock price rose above $25 in the near term. (Hendelman Decl. at ¶ 28.)

From December 2 through 13, 2016, the Achar Account continued to buy both NeuStar stock and NeuStar call options with a strike price of $25 and an expiration date of December 16, 2016. (Ex. 11 to the Hendelman Decl.) On December 2, 2016, in his IRA, Krishnamoorthy bought 6 call options

with a strike price of $25 and an expiration date of December 16, 2016. (Ex. 11 to the Hendelman Decl.) From December 2 through 13, 2016, the accounts also sold NeuStar calls and, as NeuStar's stock price began to rise, closed out some stock positions. (*Id.*)

### C.      NeuStar Announces Its Planned Acquisition by Golden Gate.

On December 13, 2016, NeuStar's stock price closed at $27.65 per share. (Hendelman Decl. at ¶ 31 and Ex. 13.) That day, 637,328 shares of NeuStar stock traded on the markets. (Hendelman Decl. at ¶ 31 and Ex. 13.)

On December 14, 2016, at 8:00 a.m. Eastern Standard Time, NeuStar issued a press release announcing that it had entered into an agreement to be acquired by a private investment group, led by Golden Gate, for approximately $2.9 billion, including debt to be refinanced. (Hendelman Decl. at ¶ 32 and Ex. 12.) Under the terms of the agreement, stockholders would receive $33.50 per share in cash after the proposed acquisition closed. (Hendelman Decl. at ¶ 32 and Ex. 12.)

When the markets opened on December 14, 2016, NeuStar's stock traded at $33.40 per share—an increase of $5.75 per share, or approximately 21%, over the previous day's closing price. Hendelman Decl. at ¶ 33 and Ex. 13.) The stock price closed that day at $33.45. (Hendelman Decl. at ¶ 31 and Ex. 13.) Approximately 15.9 million shares of NeuStar traded that day, about 25 times the previous day's volume. (Hendelman Decl. at ¶ 31 and Ex. 13.)

### D.      Krishnamoorthy and Achar Profit from the NeuStar Positions

On December 14, 2016, after NeuStar's announcement, Krishnamoorthy sold the remaining NeuStar call options in his IRA at a profit. (Hendelman Decl. Ex. 11.) That day, the Achar Account sold all its remaining shares of NeuStar stock and sold some of its call options, among other things. (*Id.*) Based on these and other NeuStar securities positions the accounts put on before NeuStar's announcement, Krishnamoorthy's IRA profited by approximately $18,510 and the Achar Account

profited by approximately $29,917.50, in both realized and unrealized gains. (Hendelman Decl. at ¶ 30 and Ex. 11.)

## V.   ACHAR TRANSFERS FUNDS FROM HER BROKERAGE ACCOUNT.

Months later, on approximately April 4, 2017, the Investment Bank confronted Krishnamoorthy about his trading in NeuStar, after the firm received a request for information from the Financial Industry Regulatory Authority (FINRA). (Levine Decl. at ¶ 14.) Krishnamoorthy then turned over his and Achar's brokerage records to the Investment Bank for the first time. (Levine Decl. at 14.)

That day, approximately $20,000 from the Achar Account was transferred to a separate bank account at Bank of America (the "Bank Account"). (Hendelman Decl. at ¶ 34 and Ex. 14.) Over the next two weeks, approximately $47,000 more was transferred out of the Achar Account to the Bank Account. (Hendelman Decl. at ¶ 34 and Ex. 14.) In total, in the three-week period after April 4, 2017, the Achar Account transferred nearly half its funds to the Bank Account. (Hendelman Decl. at ¶¶ 34–35 and Ex. 15.)

## ARGUMENT

## I.   THE COURT SHOULD FREEZE KRISHNAMOORTHY'S ASSETS.

"A freeze of assets is an ancillary remedy that merely 'assures that any funds that become due can be collected,'…including disgorgement of profits, penalties equal to three times the profits, …and possibly prejudgment interest." *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 416 (S.D.N.Y. 2001) (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990)). An asset freeze simply "functions like an attachment." *Unifund*, 910 F.2d at 1041.

To obtain an asset freeze, "the SEC must demonstrate only (1) a concern that defendants will dissipate their assets or transfer them beyond the jurisdiction of the United States, and (2) a basis to infer that they traded on inside information." *Gonzalez de Castilla*, 145 F. Supp. 2d at 415

(citing *Unifund*, 910 F.2d at 1041); *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) ("Where an asset freeze is involved, the SEC must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws.") (internal quotation marks and citations omitted). This standard is lower than the required showing for the Commission to obtain a preliminary injunction against future securities law violations. *See Unifund*, 901 F.2d at 1041 (holding that "an ancillary remedy" of an asset freeze "may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established"); *SEC v. Hedén*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999) (holding that an asset freeze requires "a lesser showing" than a preliminary injunction against future securities law violations).

The Commission is likely to succeed on the merits of its insider trading claims against Krishnamoorthy under Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 thereunder. At a minimum, an inference can be drawn that Krishnamoorthy illegally traded on inside information. Either way, an asset freeze is appropriate, particularly to prevent Krishnamoorthy from moving funds to a foreign bank account or otherwise dissipating assets to avoid having to satisfy an eventual monetary judgment against him.

**A.      The Commission Is Likely To Succeed on Its Claims Under Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5.**

Exchange Act Section 10(b) and Rule 10b-5—anti-fraud provisions—prohibit insider trading. *Salman v. United States*, 137 S. Ct. 420, 423 (2016); *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The Supreme Court has recognized two legal theories of insider trading: the classical theory and the misappropriation theory. *Obus*, 693 F.3d at 284–85 (citing cases). Under the misappropriation theory applicable here, "it is a violation of Section 10(b) and Rule 10b–5 to misappropriate, for the purpose of trading in securities, material nonpublic information about the securities in breach of a duty owed to the source of the information." *SEC v.*

9

*Conradt*, 947 F. Supp. 2d 406, 410 (S.D.N.Y. 2013) (citing *United States v. O'Hagan*, 521 U.S. 642, 652 (1997)). A person thereby violates Section 10(b) and Rule 10b-5 "when he obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose and then (c) misappropriates or otherwise misuses that information (d) with scienter, (e) in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make 'secret profits.'" *Gonzalez de Castilla*, 145 F. Supp. 2d at 412 (citing *Dirks v. SEC*, 463 U.S. 646, 654 (1983)).

The elements of a Section 17(a) violation are essentially the same as the elements of a Section 10(b) and Rule 10b-5 violation, except that Section 17(a) requires the illegal trading to occur in the "offer or sale" of a security rather than in connection with the "purchase or sale." *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (noting that "[e]ssentially the same elements are required under Section 17(a)(1)–(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)"); *see also SEC v. Svoboda*, 409 F. Supp. 2d 331, 342 (S.D.N.Y. 2006) (granting summary judgment to the Commission on its Section 17(a) insider trading claim against defendants where defendants had been criminally convicted of insider trading under Section 10(b) and Rule 10b-5).

The Commission is likely to succeed in proving that Krishnamoorthy's conduct met each of these elements and therefore violated Section 17(a), Section 10(b), and Rule 10b-5. At a minimum, an inference can be drawn that Krishnamoorthy violated those provisions.

### 1. *The Investment Bank's NeuStar Acquisition Information Was Material.*

"Few matters are more material than a corporation's involvement in a possible merger or acquisition." *SEC v. Sekhri*, 2002 WL 31100823, at *13 (S.D.N.Y. July 22, 2002). The Supreme Court and Second Circuit have therefore concluded that merger and acquisition negotiations are often material even at early stages: "Since a [transaction] in which it is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information,

as regards a [transaction] of this sort, can become material at an earlier stage than would be the case as regards lesser transactions—and this even though the mortality rate of [transactions] in such formative stages is doubtless high." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (quoting and expressly agreeing with *SEC v. Geon Indus., Inc.*, 531 F.2d 39, 47 (2d Cir. 1976)). Among other factors, "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries" can indicate that merger or acquisition discussions are sufficiently serious that they become material to a reasonable investor. *Id.* at 239. "Moreover, where information regarding a merger originates from an insider, the information, even if not detailed, 'takes on an added charge just because it is inside information.'" *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (quoting *Geon Indus.*, 531 F.2d at 47). Evidence demonstrating the materiality of a merger or acquisition can include a "substantial increase in the stock price upon the public announcement" of the transaction. *Sekhri*, 2002 WL 31100823, at *13.

The Investment Bank's confidential information about NeuStar's acquisition by Golden Gate was precisely this kind of highly material inside information. Indeed, the market found the acquisition material: immediately after NeuStar's announcement that Golden Gate had agreed to acquire it, NeuStar's stock price and trading volume rose significantly. (Hendelman Decl. at ¶¶ 31–33 and Ex. 13.)

2.  *The NeuStar Acquisition Information Was Non-Public.*

Information becomes public only when disclosed "'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,' or when, although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular'" security. *Mayhew*, 121 F.3d at 50 (quoting *Dirks*, 463 U.S. at 653 n.12 (1983) & *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993)). The NeuStar acquisition was highly confidential and non-public. The Investment Bank agreed to kept the information

11

confidential and labeled the documents Krishnamoorthy received with this information "[h]ighly confidential," "For Internal Use Only," and "Strictly private and confidential." (Hendelman Decl. at ¶¶ 18–23 and Exs. 7,8,9,10.) Just after the NeuStar acquisition was publicly announced, NeuStar's stock price and trading volume rose substantially. (Hendelman Decl. at ¶¶ 31–33 and Ex. 13.) Knowledge of the NeuStar acquisition had not been therefore fully impounded into the market price until the announcement.

3.   *Krishnamoorthy Misused or Misappropriated the Information By Trading on It.*

A defendant misuses or misappropriates material, non-public information when he trades while in possession of such information or recommends that someone else trade. "[A]nyone in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968); *see also SEC v. Drucker*, 528 F.Supp.2d 450, 452 (S.D.N.Y. 2007) ("From the time [defendant] acquired that inside information, he was barred from trading in, or causing anyone else to trade in, NBTY stock until such time as the information became public."); 17 C.F.R. § 240.10b5-1 ("[A] purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information about that security or issuer if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale.").

Krishnamoorthy misused or misappropriated the Investment Bank's confidential information about NeuStar's acquisition by trading (and/or directing his wife to trade) while in possession of the information. As the Investment Bank's employee, Krishnamoorthy received confidential information about the acquisition. (Hendelman Decl. at ¶¶ 18–23 and Exs. 7,8,9,10.) Krishnamoorthy knew that the Investment Bank prohibited him from using its material, nonpublic

information to trade in securities. (Hendelman Decl. at ¶¶ 13–15 and Exs. 5, 6.) Yet Krishnamoorthy purchased (and sold) NeuStar call options and stock before the acquisition was announced—essentially betting that NeuStar's stock price would rise. (Hendelman Decl. at ¶¶ 27–28 and Ex. 11.) He did so using his own brokerage account and his wife's account, the Achar Account (or directed her to make trades in her account). (Hendelman Decl. at ¶¶ 27–28 and Ex. 11.) Just before and after NeuStar announced the acquisition agreement, Krishnamoorthy closed out most of the stock and options positions in his and his wife's accounts for a realized and unrealized profit of approximately $48,000. (Hendelman Decl. at ¶ 30.) Furthermore, neither Krishnamoorthy's IRA nor the Achar Account had ever traded in NeuStar securities before Krishnamoorthy learned of the confidential NeuStar acquisition. (Hendelman Decl. at ¶¶ 27–28.) A jury is therefore likely to conclude that Krishnamoorthy's pattern of highly suspicious trading, coupled with his receipt of the Investment Bank's confidential information about the acquisition, demonstrates that he misused or misappropriated the information by trading on it.

4. *Krishnamoorthy's Trades Breached His Duties of Trust and Confidence for Secret Profit.*

Krishnamoorthy breached a duty of trust and confidence under the misappropriation theory. The misappropriation theory "targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market." *Obus*, 693 F.3d at 284. The paradigmatic misappropriation case involves an employee who, when entrusted by his employer with confidential information, owes a duty of loyalty and confidentiality to his employer. *See, e.g.*, *O'Hagan*, 521 U.S. at 654 (holding that a law firm employee could be held criminally liable for insider trading on the misappropriation theory where he breached a duty of loyalty and confidentiality to his law firm employer). Under this theory, "[t]he employee['s] undisclosed embezzlement or

13

'misappropriation' of market-sensitive confidential information from [his] employer" for insider trading defrauds the employer. *United States v. Whitman*, 904 F. Supp. 2d 363, 367 (S.D.N.Y. 2012).

Under the misappropriation theory, Krishnamoorthy breached a duty of trust and confidence to the Investment Bank for his personal benefit. The Investment Bank had entrusted Krishnamoorthy—its employee and a vice president—with confidential information about NeuStar's impending transaction by Golden Gate. (Hendelman Decl. at ¶¶ 8, 20–23.) Based on policies he learned when he joined the Investment Bank, Krishnamoorthy knew he was required to maintain the confidentiality of the Investment Bank's confidential information and refrain from trading on material nonpublic information. (Hendelman Decl. at ¶¶ 14–16.) Yet, on the basis of the confidential acquisition information he obtained, he traded in his own account for a profit of $18,510 and traded or directed his wife to trade in her account for a profit of $29,917.50. (Hendelman Decl. at ¶ 30.) Krishnamoorthy thereby breached his duty to the Investment Bank.

     *5.   Krishnamoorthy Acted With Scienter.*

Scienter is a "mental state embracing [the] intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). "In every insider trading case, at the moment of tipping or trading, just as in securities fraud cases across the board, the unlawful actor must know or be reckless in not knowing that the conduct was deceptive." *Obus*, 693 F.3d at 286. To be held liable, the insider must first trade the securities "deliberately or recklessly, not through negligence." *Id.* Second, he "must know that the information that is the subject of the [trade] is non-public and is material for securities trading purposes or act with reckless disregard of the nature of the information." *Id.* Finally, he "must know (or be reckless in not knowing) that to disseminate the information would violate a fiduciary duty. While [he] need not have specific knowledge of the legal nature of a breach of fiduciary duty, he must understand that tipping [or trading on the basis of] the information would be violating a confidence." *Id.* In securities fraud cases like this one,

"circumstantial evidence can be more than sufficient" to prove scienter, particularly given "the difficulty of proving the defendant's state of mind." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 391 n.30 (1983).

Krishnamoorthy traded on inside information with scienter. First, Krishnamoorthy's trades were deliberate: he did not accidentally make the trades. *See Obus*, 693 F.3d at 287. Second, Krishnamoorthy knew that the Investment Bank's information about NeuStar's acquisition was material and nonpublic. The documents he received about the acquisition were labeled "[h]ighly confidential" and "Strictly private and confidential," among other things. (Hendelman Decl. at ¶¶ 20–23.) Third, he knew that his trading on the acquisition information violated a confidence, both because he knew the Investment Bank's policy prevented him from using material, nonpublic information to trade and because he concealed the brokerage accounts he used for the trades from the Investment Bank. (Hendelman Decl. at ¶¶ 14–16; Levine Decl. at ¶ 12.) The only plausible inference is that Krishnamoorthy sought to conceal his trading from the Investment Bank because he knew his conduct violated a duty of confidence and indeed was illegal.

**B.      The Court Should Freeze Krishnamoorthy's Assets, Up to $163,977.60.**

Krishnamoorthy faces potential liability of at least $163,977.60: $18,510 in disgorgement, prejudgment interest of approximately $185.10, plus a penalty of triple the proceeds of the insider trading he orchestrated in his and his wife's accounts. *See* 15 U.S.C. §§ 78u-1(a)(3) ("The amount of the penalty which may be imposed on the person who committed such [insider trading] violation shall be determined by the court…but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase, sale, or communication."); *SEC v. Warde*, 151 F. 3d 42, 49 (2d Cir. 1998) (affirming district court's order attributing insider trading proceeds obtained by "[t]he third parties for whom [defendant] purchased shares"—including defendant's wife—to the

defendant for purposes of calculating his trading profits); (Hendelman Decl. at ¶ 37 and Ex. 17

(calculating Krishnamoorthy's profits from insider trading and prejudgment interest thereon).)

As an Indian citizen in the United States on a work visa (Hendelman Decl. at ¶ 11)

Krishnamoorthy likely holds one or more foreign bank accounts. His wife, also an Indian citizen, likely

holds one or more foreign bank accounts, too. Without an asset freeze, Krishnamoorthy is likely to

dissipate funds or transfer funds to foreign accounts beyond the Court's jurisdiction, rendering the

Commission unable to collect disgorgement, prejudgment interest, and a civil penalty from

Krishnamoorthy after obtaining a final judgment. An asset freeze is therefore necessary and

appropriate. *See, e.g., Gonzalez de Castilla*, 145 F. Supp. 2d at 420 (granting asset freeze where

defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a

danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his

account did not remain frozen") (citing *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212,

215–16 (1945) (holding, in antitrust action, that "sequestration of [defendants'] property is the only

means of enforcing this Court's orders or decree against said foreign corporate defendants. The

principal business of said defendants is carried on in foreign countries and they could quickly

withdraw their assets from the United States and so prevent enforcement of any order or decree

which this Court may render.")).

## II.     THE COURT SHOULD FREEZE ACHAR'S ASSETS, UP TO $29,917.50.

"A freeze order can apply to non-parties, such as relief defendants allegedly holding the

funds of defendants." *Hedén*, 51 F. Supp. 2d at 299; *see also Smith v. SEC*, 653 F.3d 121, 128 (2d Cir.

2011) (holding that the "plenary powers of a federal court to order an asset freeze" can apply to a

relief defendant's assets). To obtain an asset freeze against a relief defendant, the Commission must

show that "it is likely to succeed on the merits" of its claim against the relief defendant. To succeed

on the merits, the Commission must show that the relief defendant: "(1) has received ill-gotten

funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). The Commission is likely to succeed in proving both of these elements.

First, Achar received the ill-gotten proceeds of Krishnamoorthy's illegal trading activity. Krishnamoorthy likely executed—directly or indirectly—the NeuStar stock and options trades in the Achar Account. (Levine Decl. at ¶ 8.) Achar thereby profited by $29,917.50 from these trades in her account. (Hendelman Decl. at ¶ 30.)

Second, Achar has no legitimate claim to these illegal insider trading proceeds. Achar is Krishnamoorthy's wife, and Krishnamoorthy directly or indirectly used the Achar Account to make the trades. The Commission is therefore likely to show that Achar provided no consideration for the funds and therefore has no claim to them. *See Cavanagh*, 155 F.3d at 137 (affirming district court order freezing relief defendant wife's fraud proceeds where her defendant husband had deposited the relevant stock in her account).

The Court should therefore freeze Achar's assets up to $29,917.50, the amount of her likely disgorgement based on the profits of the illegal insider trading in the Achar Account. (Hendelman Decl. at ¶ 30.) Approximately $67,000 has already been transferred out of the Achar Account over the last few weeks. (Hendelman Decl. at ¶ 34.) Without an asset freeze, Achar will likely continue to transfer funds out of her account.

### III.   THE COURT SHOULD ORDER KRISHNAMOORTHY TO REPATRIATE FUNDS LOCATED ABROAD.

Exchange Act Section 21(d)(5) authorizes the Court to grant equitable relief "that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Under this provision, courts routinely order defendants and relief defendants to repatriate assets held in foreign accounts or locations, usually to help effectuate an asset freeze. *See, e.g., SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *13 (S.D.N.Y. July 29, 2011) ("[A]n order to bring assets to the United States is appropriate if needed to make effective an asset freeze and preserve assets for potential future

relief."); *SEC v. Illarramendi*, 2011 WL 2457734, at *6 (D. Conn. 2011) ("[W]here the Court has the authority to order equitable relief such as an asset freeze in order to preserve particular funds in anticipation of potential future disgorgement, it also has the authority to order repatriation of assets to effectuate that freeze order."). A repatriation order is appropriate here, particularly if Krishnamoorthy's assets in the United States are insufficient to satisfy a likely money judgment. The Commission therefore seeks an order requiring Krishnamoorthy to repatriate funds or other assets he holds in foreign locations by moving them to the United States—up to the amount of any difference between the total requested freeze amount of $163,977.60 and the amount of his assets in the United States, as illustrated in footnote 1 above.

## IV.    THE COURT SHOULD ORDER KRISHNAMOORTHY AND ACHAR NOT TO ALTER, DESTROY, OR CONCEAL DOCUMENTS.

To preserve documents that the Commission may later seek through discovery requests, the Commission seeks an order prohibiting Krishnamoorthy and Achar from altering, destroying, or concealing documents, including documents concerning the allegations of the Complaint or the assets or finances of Krishnamoorthy or Achar. Such orders are routinely granted "to preserve the status quo until a final resolution of the merits." *SEC v. Spongetech Delivery Sys., Inc.*, 2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (citing *Unifund*, 910 F.2d at 1040 n. 11).

## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's emergency application.

Dated: New York, New York
      April 24, 2017

Preethi Krishnamurthy
Alison R. Levine
Thomas P. Smith, Jr.
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0116 (Krishnamurthy)
KrishnamurthyP@sec.gov